# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CITY OF CHICAGO,

               Appellant,

      v.

MARILYN O. MARSHALL,

           Appellee.

No. 22-cv-05480

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

In this bankruptcy proceeding, the City of Chicago appeals the bankruptcy court's order interpreting a provision of the Chapter 13 Bankruptcy Plan. For the reasons that follow, the bankruptcy court's order is affirmed.

## I.  BACKGROUND

This appeal arises out of the execution of Debtor Linda Stamps's Chapter 13 bankruptcy plan (the "Plan") by Trustee Marilyn O. Marshall. (Dkt. 11 at 9–10.) Among other debts, the Plan addresses a mortgage on the Debtor's primary residence given to Ocwan Leasing, as well as a separate claim for unpaid water and gas bills held by the City of Chicago and secured by an interest in the Debtor's home. (*Id.*)

The Plan was completed using National Form 113 (the "Form"). (Dkt. 14 at 6; Dkt. 7-2 at 81.) The debts in question are listed in Part 3: "Treatment of Secured Claims"; Ocwan's claim (the mortgage) is properly listed in ¶ 3.1, and the City's claim is properly listed in ¶ 3.2. (Dkt. 11-1 at 53–54.) As required by 11 U.S.C. § 362(a), a

stay was automatically emplaced preventing any debtor from bringing a claim to enforce its debt. (Dkt. 11 at 10.)

After the Plan went into effect, Ocwan filed a motion to lift the automatic stay. (*Id.*) But instead of the bankruptcy court adjudicating the motion, the Debtor and Ocwan negotiated what the bankruptcy court called a "repay order." (*Id.*; Dkt. 11-1 at 78.) That agreement established that if debtor missed one payment, the stay would automatically lift. (*Id.* at 79.) The Debtor missed a later payment, and the stay automatically lifted. (Dkt. 1-5 at 3.)

A few months later, the Trustee requested from the City a refund for two months' worth of payments the Trustee mistakenly made to the City following the lifting of the automatic stay as to the mortgage loan. (Dkt. 11-1 at 82.) The Trustee explained that the lifting of the stay triggered the operation of ¶ 3.1 of the Plan, which ended the Trustee/Debtor's obligation to make payments to the City. (*Id.*) ¶ 3.1 reads:

> If relief from the automatic stay is ordered as to any item of collateral listed in this paragraph, then, unless otherwise ordered by the court, all payments under this paragraph as to that collateral will cease, and all secured claims based on that collateral will no longer be treated by the plan.

(Dkt. 11-1 at 139.)

The City moved the bankruptcy court for a declaration that the Trustee still had an obligation to pay the City (*Id.* at 89); the Trustee disagreed (*Id.* at 104). Siding with the Trustee, the bankruptcy court held that the plain language of ¶ 3.1 was clear: the phrase "all secured claims" included the City's claim, so treatment of that claim under the Plan—payments from the Trustee to the City—should have ceased

upon lifting of the stay. (Dkt. 1-5 at 15–18, 31.) That ruling prompted this appeal, in which the City argues that the bankruptcy court's interpretation of ¶ 3.1 was flawed. (*See generally* Dkt. 11.) In her response, the Trustee adopted the bankruptcy court's interpretation of ¶ 3.1. (*See generally* Dkt. 14.)

## II.    STANDARD OF REVIEW

District courts have jurisdiction to review final orders from bankruptcy courts. *See* 28 U.S.C. § 158(a). At issue in this appeal is a legal question concerning interpretation of the bankruptcy plan's language, meaning that the standard of review is *de novo*. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011).

The Plan itself is within a unique category of legal text. It is not quite a statute because it can be modified (within certain limits) by the parties (Dkt. 1-5 at 12), yet it similarly is not quite a contract because it was "promulgated by the Rules Committee and approved by the Judicial Conference of the United States" (*Id.* at 9 n.2 (quoting *In re Orsei*, 389 B.R. 339, 354 (Bankr. S.D.N.Y. 2008)).) In the view of the bankruptcy judge, the proper method of interpretation of the Plan was "[t]o focus on the Plan as written, and to give words their plain meaning." (*Id.* at 14.) In the City's view, it makes no difference whether the Plan is analyzed as a contract or a statute: the end result is the same. (Dkt. 15 at 7 ("All of the canons of construction the City employs here apply to both types of legal texts.").) For her part, the Trustee argues that the Plan should be analyzed as a contract, but she too contends that how the text is categorized makes little difference to the result. (Dkt. 14 at 16–17.)

As the bankruptcy court held in a carefully reasoned opinion, the interpretation of ¶ 3.1 required no aid from any canons of construction because "the meaning of the language at issue is plain." (Dkt. 1-5 at 2.) Taking a nondeferential look at the issue under the de novo standard of review, this Court agrees, as explained below, that the plain language of the Plan controls and mandates a judgment in the Trustee's favor.

## III. DISCUSSION

At issue is ¶ 3.1 of the Plan, which addresses the effect on payments if the automatic stay is lifted as to collateral providing security for secured claims:

> If relief from the automatic stay is ordered as to any item of collateral listed in this paragraph, then, unless otherwise ordered by the court, all payments under this paragraph as to that collateral will cease, and all secured claims based on that collateral will no longer be treated by the plan."

(Dkt. 11-1 at 139.) The parties' arguments center around the interaction between two of this provision's clauses: "all payments under this paragraph as to that collateral will cease" (the "first clause"), and "all secured claims based on that collateral will no longer be treated by the plan" (the "second clause").

The City characterizes "the sole issue on appeal" in this way: "whether ¶ 3.1 of the National Plan terminates payments to all secured creditors with a lien on the property listed in that paragraph, even when their payments are not provided for in that paragraph, when the mortgage holder lifts the stay." (Dkt. 11 at 17.) The City argues that it does not.

In support of its conclusion that ¶ 3.1 should be read narrowly, the City raises two principal arguments, each of which is addressed in turn. Its first argument is that the bankruptcy court's interpretation violates the rule against surplusage and other canons of construction. *(Id.* at 20–29.) It is clear that only the second clause of ¶ 3.1 applies to the City's claim, because that claim is governed by ¶ 3.2 (not "this paragraph" (meaning ¶ 3.1)). But if the operation of ¶ 3.1 results in cessation of payments governed by paragraphs other than ¶ 3.1, the argument goes, then the first clause will be completely read out of the plan. (*Id.* at 24–26.)

A second argument relates to the broader question of confirmability if the bankruptcy court's interpretation is affirmed. As the City contends, the bankruptcy court's interpretation of ¶ 3.1 would have the practical effect of rendering all bankruptcy plans utilizing Form 113 unconfirmable under 11 U.S.C. § 1325(a)(5)(B). (*Id.* at 29–31.) In support, the City provides what it maintains is the correct reading of ¶ 3.1. (*Id.* at 32.)

### A.    Problems of Interpretation

According to the City, the bankruptcy court's interpretation of the Plan was wrong in several ways: (1) the invocation of the "plain meaning" of the text was incorrectly cabined to the language of the second clause rather than ¶ 3.1 and the Plan as a whole; (2) the bankruptcy court's interpretation rendered the first clause superfluous; (3) the bankruptcy court's reading resulted in the more general clause (the second clause) to swallow the more specific (the first clause); and (4) the bankruptcy court's interpretation would run counter to the Plan's purposes of notice

and clarity. (Dkt. 11 at 24–34.) The common denominator of these arguments is the interplay between the two clauses: in each of these ways, the City argues that the bankruptcy court's interpretation renders the first clause "completely ineffective and wholly superfluous." (*Id.* at 24, 28.)

With due regard to the City's well-presented argument, the Court agrees with the bankruptcy court's judgment. A careful reading of the relevant language shows that the "plain meaning of the words" in ¶ 3.1 is unambiguous. Moreover, that language requires that *all* secured claims based on the collateral listed in ¶ 3.1 be no longer treated by the plan—and "all" includes the City's claim. (Dkt. 11-1 at 4, 18–19.)

Examining the entirety of the Form confirms this conclusion. Part 3 of Form 113 addresses the Treatment of Secured Claims, and ¶ 3.1 specifically concerns the maintenance of "contractual installment payments on the secured claims listed below." (Dkt. 11-1 at 53). Because the City is not a mortgage holder that may be provided for under ¶ 3.1 (it is not the recipient of contractual installment payments), the City concedes its claim was properly placed in ¶ 3.2 of the Plan. (Dkt. 11 at 13.) Under ¶ 3.1, if "relief from the automatic stay is ordered as to any item of collateral listed in this paragraph" (here, the mortgage on 5307 S. Hermitage Ave.), then, unless otherwise ordered by the court, "all payments under this paragraph as to that collateral [*i.e.*, the installment payments on the Hermitage property] will cease, and all secured claims based on that collateral [*i.e.*, all secured claims based on the Hermitage property] will no longer be treated by the plan." (Dkt. 11-1 at 53.)

The City argues that ¶ 3.1 should be read to cease *only* the installment payments listed in ¶ 3.1, not any other secured claims based on that collateral. (Dkt. 11 at 16.) But that interpretation would unduly distort what is otherwise a straightforward textual command. As written, ¶ 3.1 completes two objectives: first, it dictates when the installment payments as to the collateral listed in ¶ 3.1 "will cease." As the City concedes, because its secured claim is not an installment payment, it could not be listed in ¶ 3.1. But the drafters of ¶ 3.1 included an additional provision addressing other secured claims listed outside of ¶ 3.1 when they added the phrase, "and all secured claims based on that collateral will no longer be treated by the plan." That additional language forecloses any finding of an ambiguity: the first clause governs the effect that relief from the automatic stay has on installment payments as to the collateral listed in ¶ 3.1, and the second clause governs other secured claims based on that collateral that are not listed in ¶ 3.1.[1]

Raising the specter of surplusage does not save the City's argument. Although the second clause might risk some surplusage (Dkt. 11 at 27–31), the canon against surplusage is a tool, not an "absolute," and surplusage "does not always produce

---

[1] The distinction is subtle but important. The first clause is directed at "all payments under this paragraph *as to that collateral*," while the second clause is directed at "all secured claims *based on that collateral* . . . ." (Dkt. 11-1 at 54) (emphasis added). The first clause is best read to cease installment payments *as to* the Hermitage Property, while the second clause is best read to cease treatment by the plan of secured claims that are *based on*, but are not installment payments for, the collateral (the Hermitage Property). Reading ¶ 3.1 in this manner addresses the City's surplusage concern by giving effect "to every clause and part of a statute" without having to adopt the City's strained interpretation that "all secured claims" somehow does not mean *all* secured claims. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (discussing the interaction between the general/specific canon and superfluity).

7

ambiguity." *Lamie v. United States Tr.*, 540 U.S. 526, 536 (2004). That the first and second clauses operated to cease all payments is not impermissible surplusage. It is, as the bankruptcy court correctly found, an additional consequence of relief from the automatic stay dictated by the unambiguous words of ¶ 3.1. (Dkt. 11-1 at 20.)

Because the City's secured claim is indisputably "based on" the Hermitage property, the dispositive interpretive question is what the phrase "treated by the plan" encompasses and whether that includes payments. As the bankruptcy court held, "treated" includes, but is not limited to, payments. (*Id.* at 20–21.) Part 3 of Form 113, under which ¶ 3.1 and ¶ 3.2 are situated, is labeled "Treatment of Secured Claims." The face of the Form thus reflects that "treatment" of a claim includes the installment or monthly payments to creditors listed in those sections.

Nor is the phrase "treated by the plan" limited only to rigid installment payments. Again as the bankruptcy court noted, "treated by the plan" goes "beyond just payments" because a creditor secured by real estate can be "treated" many ways within a confirmed plan. (Dkt. 11-1 at 20–21.) For instance, "treatment" of a claim can include more complex arrangements than installment payments, such as an arrangement in which "the mortgage loan matures during the plan period, [and] the debtor [] modif[ies] the loan and pay[s] the secured portion of the loan over the plan period." *In re Park*, 532 B.R. 392, 395 (Bankr. M.D. Fla. 2015). A Chapter 13 bankruptcy plan may also "leave unaffected" the rights of the mortgage holder, which is another example of "treatment" that is not a payment. *See id.* at 394–95; 11 U.S.C. § 1322(b)(2). As such, the second clause might work to cease payments on secured

claims based on the collateral listed in ¶ 3.1, as it did here, but it may have other effects because it ceases all forms of treatment, not just payment.

As to the City's argument that this interpretation undercuts notice and clarity of the Plan (Dkt. 11 at 31), the Trustee points out that Part 1 of the Plan, labeled "Notices," includes a paragraph directed to creditors that reads in boldface type: "**Your rights may be affected by this plan. Your claim may be reduced, modified, or eliminated.** You should read this plan carefully . . . ." (Dkt. 14 at 12; Dkt. 11-1 at 52.) Although the Trustee's interpretation of ¶ 3.1 requires creditors whose claims are governed by a different provision of the Plan to read other paragraphs, that result is not sufficiently damning to require a reading at odds with the plain text of the Plan. And as discussed below, bankruptcy law provides creditors with numerous avenues to clarify the Plan's impact on their claims before Plan confirmation.

### B. Problems of Confirmation

As a separate argument, the City contends that the Trustee's reading of ¶ 3.1 would render the Plan unconfirmable over objection. (Dkt. 11 at 34 (citing 11 U.S.C. § 1325(a)(5)(B)).) Section 1325(a)(5)(B) requires that "the plan *must* provide that the secured creditor's claim *will* be paid the present value of its secured claim." (*Id.* at 35 (emphasis in original).) According to the City, the bankruptcy court's approach results in "plan terms that allow the debtor to successfully complete her plan without paying the secured creditor the full value of its secured claim," which "certainly" precludes confirmation. (*Id.* at 36.) The Trustee argues that a plain language reading of ¶ 3.1

9

does not render the Plan unconfirmable because a plan is a plan, not a guarantee. (Dkt. 14 at 25.)

Under 11 U.S.C. § 1325(a)(5)(B), a court must confirm a plan over a creditor's objection if, among other things, the plan provides that the holder of the claim retain the lien securing the claim until payment of the debt or discharge, and "if the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." As the Trustee correctly argues, confirmation of a plan under the requirements of Section 1325(a)(5)(B) is not a guarantee of payment. Rather, confirmation under subsection (B) guarantees that the plan will adequately calculate distributions by the debtor proportional to the debts listed and ensure that claimholders retain liens with which they may pursue claims outside of bankruptcy should the plan not be completed as intended.

Quoting the Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 469 (2004), the City argues that, to be confirmable over objection, the plan's proposed payments " 'must be calibrated to ensure that' " the creditor receives its due payments. (Dkt. 11 at 34–35.) But just one paragraph above that quoted language, the Supreme Court called Section 1325(a)(5)(B)'s requirements a "*promise* of future property distributions," not a *guarantee* of such. *Till*, 541 U.S. at 468 (emphasis added).

Moreover, the existence of two safeguards in the Plan undercut the City's arguments. First, ¶ 3.1 includes the phrase " . . . unless otherwise ordered by the

10

court." Although the plain language of the Plan triggers cessation of payments to the City in the event of a lifting of the stay, that occurrence can be avoided or reversed upon court order. And second, as the bankruptcy court explained, provision ¶ 8.1 of the Plan "provides for alternative treatment negotiated by the parties, so long as [the alternative treatment] is consistent with the Bankruptcy Code. Any secured creditor who wishes to negotiate continued treatment by the plan after the court grants relief from the stay may do so." (Dkt. 1-5 at 18.) As it has done in the past, the City could have negotiated such alternative treatment here. (*Id.* at 19.) Although the City's election not to propose such a provision in this case does not definitively moot its argument, if the Plan is to be interpreted as a contract, this earlier course of conduct cuts against the City's current argument. It knew that it had an opportunity to include an insulating provision in the Plan, but the City chose not to pursue that step.

### C.    The City's approach

Taking a different tack, the City argues that the second clause, properly read, "has the effect of trigging other effects under the Federal Rules of Bankruptcy Procedure and the Bankruptcy Code, such as under Rule 3002.1 and 11 U.S.C. § 1328." (Dkt. 11 at 37.) Rule 3002.1 is a notice rule: "The holder of [a claim secured by a security interest in the debtor's primary residence] shall file and serve on the debtor, debtor's counsel, and the trustee a notice of any change in the payment amount" until "an order terminating or annulling the automatic stay becomes effective . . . ." Fed. R. Bank. P. 3002.1. The City quotes the advisory committee notes to contend that "[b]ecause Rule 3002.1(a) currently requires a home mortgage claim

to be 'provided for . . . in the debtor's plan' in order for the rule to apply, [¶ 3.1] is intended to render Rule 3002.1 no longer applicable after relief from the stay is granted." (Dkt. 11 at 38 (quoting Agenda Book, Advisory Committee on Rules of Bankruptcy Procedure, Sept. 23, 2013, at 7 (hereinafter "Agenda Book").) From that language, the City argues that the purpose of the second clause is to codify the approach that "lifting the stay and stopping payments would also mean Bankruptcy Rule 3002.1 no longer applied." (Dkt. 15 at 21.)

There are at least two problems with this argument.[2] First, the quoted language from the advisory committee is found in a section labeled, "Should the Applicability of Rule 3002.1 Be Clarified?" Agenda Book at 4. That section unsurprisingly focused on proposed changes to Rule 3002.1, not the formulation of a national Chapter 13 Form. At best, the language referring to the second clause of ¶ 3.1 should be considered as evidence of ¶ 3.1's application alongside Rule 3002.1, not ¶ 3.1's universal meaning.

Second, the plain words of the second clause do not match the City's proposed definition. The City argues that the second clause, "[i]f relief from the automatic stay is ordered as to any item of collateral listed in this paragraph, . . . *all secured claims based on that collateral will no longer be treated by the plan*," means, "if relief from the automatic stay is ordered . . . *other relevant provisions of the bankruptcy code*

---

[2] Both parties also grapple with other purported (and limited) evidence of the Form drafters' intent and come to different conclusions. (*See* Dkt. 14 at 22; Dkt. 15 at 17–18.) Having reviewed that evidence as introduced by the parties and finding it unpersuasive, the Court gives it no weight and focuses instead on the language of the Form and relevant bankruptcy law.

*become effective*." Put in the context of the Rule 3002.1 argument, the City argues that the second clause's "all secured claims . . . will no longer be treated" means "mortgage holders need not notify other secured claimholders of subsequent changes in payment." Although superfluity is a result that should be avoided, an interpretation disjointed from the words of the document is worse.

At bottom, the question the parties ask is whether the lifting of a stay on a mortgage holder's claim secured by a Chapter 13 debtor's primary residence results in the cessation of treatment by the bankruptcy plan as to all claims secured by that property in the absence of a contrary court order. It does. Although the Trustee's reading—which accords with the bankruptcy court's reading—might lead to a superficial risk of superfluity, the City's reading results in genuine ambiguity and places undue and unnecessary strain on the text of Plan. In view of this contrast, the Trustee's version wins the day.

A proper reading of ¶ 3.1 of the Debtor's Plan is, therefore, what the words say. When "relief from the automatic stay [was] ordered as to" the Debtor's primary residence, then "all payments under this paragraph" (the payments from the Debtor to Ocwan) "ceas[ed], and all secured claims based on that collateral" (including the City's secured claim) were "no longer [] treated by the [P]lan." As a result, the "treatment" established by the Plan as to the City's claim—namely, payments—ended upon lifting of the stay.

## IV.    CONCLUSION

For the foregoing reasons, the bankruptcy court's order is affirmed.

SO ORDERED in No. 22-cv-05480.

Date: September 11, 2025

_____

JOHN F. KNESS
United States District Judge

14